UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEPHEN KOMOREK and API
INTERNATIONAL CONSULTING GROUP, INC.

                Plaintiffs,

    -against-

CONFLICT INTERNATIONAL INC.,
MICHAEL LACORTE, and ANDREW McLAREN,

                Defendants.

Case No. 22-CV-9467 (ER)

**MEMORANDUM OF LAW**
**IN OPPOSITION TO MOTION TO DISMISS**

**BARKET EPSTEIN KEARON ALDEA**
**& LOTURCO, LLP**
666 Old Country Road, Suite 700
Garden City, New York 11530
(516) 745-1500

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................

INTRODUCTION ....................................................................................................... 1

BACKGROUND ....................................................................................................... 1

STANDARD................................................................................................................ 6

ARGUMENT .............................................................................................................. 7

     I.     DEFENDANTS' MOTION TO DISMISS THE LABOR LAW CLAIM
          SHOULD BE DENIED ............................................................................. 7

         A.  The Company's Argument Rests Upon an Obsolete Version of New York's
            Labor Law ........................................................................................... 8

         B.  The Company's Argument Ignores the Plain Text of the Pleadings and Relies
            Upon Disputed Questions of Fact ................................................... 10

            1.   The Pleadings Set Forth the Particular Policies and Practices in Issue ...  10

            2.   Dismissal is Not Warranted by the Alleged "Reciprocal Licensing
                Agreements" .................................................................................. 11

            3.   The "Complicated Patchwork of State Licensure" Does Not Undermine
                the Pleadings ................................................................................ 12

            4.   The Pleadings Do Not Reply Upon Third-Party Fault............................. 13

         C.  The Company's Reliance upon Documentary Evidence is Misplaced ........... 14

            1.   Defendant's Resort to Documentary Evidence (Ex. A to Def. Memo) Is
                Inappropriate Given the Structure of the Pleadings ................................ 14

            2.   The Documentary Evidence's Relevance Hinges on a Disputed Question
                 of Fact. ....................................................................................... 16

     II.    DEFENDANTS' MOTION TO DISMISS THE DEFAMTION
          CLAIMS SHOULD BE DENIED ...................................................... 16

         A.  The Pleadings State a Cause of Action for Libel Arising from the April
            Defamation ....................................................................................... 17

         B.  The Pleadings Sufficiently Identify Falsehood ............................................... 19

         C.  The Common Interest Privilege is Unavailable .............................................. 20

         D.  The Defendant's Analysis of Exhibit A is Erroneous.................................... 22

     III.   DEFENDANTS' MOTION TO DISMISS THE TORTIOUS INTERFERENCE
          CLAIMS SHOULD BE DENIED ...................................................... 24

A. Mr. Komorek Was Not Working on Conflict International's Behalf in the Summer of 2022............................................................................................ 26

B. Conflict International's Conduct was Sufficiently Improper to Form a Tortious Interference Claim. ...................................................................... 28

CONCLUSION................................................................................................................ 31

# TABLE OF AUTHORITIES

**Cases**

*A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*,
   73 Ohio St.3d 1 (1995) ....................................................................................... 17

*Adelson v. Harris*,
   973 F. Supp.2d 467 (S.D.N.Y. 2013) .................................................................. 17

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
   369 F.3d 212 (2d Cir. 2004) .......................................................................... 11, 13

*Borrows v. Fuyao Glass Am. Inc.*,
   2017 WL 6262189 (S.D. Ohio 2017) .................................................................. 21

*Croce v. New York Times Co.*,
   345 F. Supp.3d 961 (S.D. Ohio 2018) ................................................................ 23

*Disciplinary Couns. V. Gardner*,
   99 Ohio St.3d 416 (2003) .............................................................................. 19, 23

*Duncan v. AT & T Communications, Inc.*,
   668 F.Supp. 232 (S.D.N.Y.1987) ......................................................................... 6

*Epstein v. NYC Council of Carpenters Benefit Funds*,
   2016 WL 1718262 (S.D.N.Y. 2016) ................................................................... 14

*Fisher v. Ahmed*,
   153 N.E.3d 612 (Ct. Appeals, Ohio 2020) .......................................................... 20

*Gentile v. Turkoly*,
   86 N.E.3d 991 (Ct. Appeals, Ohio 2017) ............................................................ 24

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*,
   241 F. Supp.2d 246 (S.D.N.Y. 2007) .................................................................. 24

*In re Methyl Tertiary Butyl Ether Products Liability Litigation*,
   233 F.R.D. 133 (S.D.N.Y. 2005) ......................................................................... 12

*Kahn v. Inspector Gen. of U.S. Dept. of Health & Human Servs.*,
   848 F. Supp. 432 (S.D.N.Y. 1994) .................................................................. 6, 30

*Kienow v. Cincinatti Children's Hosp. Med. Ctr.*,
   2015 WL 6438985 (Ct. Appeals, Ohio 2015) ..................................................... 27

*Lee v. Bankers Trust Co.*,
   166 F.3d 540 (2d Cir. 1999) ................................................................................ 17

*Long v. Marubeni Am. Corp.*,
   406 F. Supp.2d 285 (S.D.N.Y. 2005) .................................................................. 23

*Mason v. Bexley City School Dist.*,
   2010 WL 987047 (S.D. Ohio 2010)......................................................... 21

*Mehta v. Ohio Univ.*,
   194 Ohio App.3d 844 (Ct. Appeals, Tenth District, 2011).............................. 19

*Michael Grecco Productions, Inc. v. Alamy, Inc.*,
   372 F. Supp.3d 131 (E.D.N.Y. 2019) ..................................................... 11, 14

*Oladokun v. Ryan*,
   2007 WL 3125317 (S.D.N.Y. 2007)........................................................ 11, 16

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007)..................................................................... 26

*Susan B. Anthony List v. Driehaus*,
   805 F. Supp.2d 425 (S.D. Ohio 2011) ..................................................... 18, 23

*Ulysse v. AAR Aircraft Component Servs.*,
   841 F. Supp.2d 659 (E.D.N.Y. 2012) ............................................................ 8

*United States ex rel. Foreman v. AECOM*,
   19 F.4th 85 (2d Cir. 2021) ....................................................................... 15

*Vail v. The Plain Dealer Publishing Co.*,
   72 Ohio St.3d 279 (1995)......................................................................... 17

*Webb-Weber v. Cmty. Action for Human Servs., Inc*,
   23 N.Y.3d 448 (2014) ................................................................................ 9

*Williams v. Time Warner Inc.*,
   440 F. Appx 7 (2d Cir. 2011)..................................................................... 15

## Statutes

Fed. R. Civ. P. 12(b)(6)......................................................... 8, 11, 14, 16, 26
Labor Law §740.......................................................................... passim
Labor Law §740(2) ........................................................................... 7, 9

## Other Authorities

Limited Reciprocity Agreement for Private Investigations (California and North Carolina),
   available at:  https://www.bsis.ca.gov/industries/pi_recip/nc.pdf .................................. 12

NEW YORK STATE, *Governor Hochul Signs Legislation Protecting Employees from Retaliation*
   (Oct. 28, 2021) ....................................................................................... 8

Private Investigator Reciprocity (Florida), available at:
   https://www.fdacs.gov/Business-Services/Private-Investigation-Licenses/Private-Investigator-Reciprocity ..................................................................... 12

   Restatement of the Law 2d, Torts (1979) ................................................. 25, 29

States With Limited Reciprocity (North Carolina), available at:
   https://files.nc.gov/ncdps/documents/files/Private-Investigator-Reciprocal-
   Agreements.pdf .......................................................................................................... 12

**INTRODUCTION**

This case is about a powerful private investigations agency who wanted to penalize and make an example of a former employee who had the temerity to question its business practices. After raising concerns about the company's billing and licensing practices and then resigning after the company tried to silence him, the employee, Stephen Komorek, had his life turned upside down by an employer determined to prove that it is too powerful to be crossed. In the aftermath of Mr. Komorek's resignation, the company and its agents engaged in a widespread smear campaign that included repeated bouts of defamation to Mr. Komorek's new business partner and one of his clients; an illegal attempt to obtain his private medical records from his time serving in the United States military; and an administrative claim brought against Mr. Komorek for the very purpose of harming his reputation and business prospects.

Mr. Komorek and his new company seek damages in connection with the crusade that his former company and its agents have instituted against him since his departure. In response, the Defendants have filed applications to dismiss the case pre-answer—but in the process rely upon an outdated version of the applicable Labor Law statute; documentary evidence that is either procedurally defective or substantially counterproductive; and an overall analysis of the pleadings that departs from the contents. The motion to dismiss should be denied.

**BACKGROUND**

Stephen Komorek ("Mr. Komorek") is a veteran of the United States military who developed a promising career as a private investigator. He began working for Conflict International Inc. ("Conflict International" or the "Company") on or about October 9, 2018, and became a formal Conflict International employee in or about April 2019. *See* Amended Complaint at ¶¶12-13.

1

When Mr. Komorek joined Conflict International, it was a small company that required Mr. Komorek to handle many different job responsibilities at once.  In that capacity, he came to learn that Conflict International's associated entity in the United Kingdom, Michael LaCorte ("Mr. LaCorte"), who ran both the United Kingdom company and Conflict International, systemically overbilled clients either by charging for work not performed or by inflating the number of hours necessary to complete a given task. *Id*. at ¶15.  When Mr. Komorek brought this to Mr. LaCorte's attention, Mr. LaCorte began to pressure Mr. Komorek to institute the same fraudulent practices in New York—at Conflict International—and Mr. Komorek refused. *Id*.

In the scope of his duties, Mr. Komorek also came to learn that Conflict International was soliciting and doing business in states in which its private investigators were not licensed but were required to be.  This included private investigation business-solicitation in the State of Florida, California, Illinois, and others, without appropriate licensure, and without being registered as a foreign corporation in any such states.  He brought such concerns to Mr. LaCorte and again was told that the company's business practices were not going to change. *Id*. at ¶16.

By late February 2022 it had become increasingly clear that Mr. Komorek's relationship with the Company was substantially soured in light of his reports to his supervisor. In turn, on February 24, 2022, Andrew McLaren ("Defendant McLaren"), acting as an agent of Conflict International, contacted a high-net-worth client of Mr. Komorek, Trudy Jacobson (the "Client" or "Ms. Jacobson"), and on information and belief falsely told her that Mr. Komorek was a thief and an embezzler, and told her to stick with Conflict International but to fire Mr. Komorek from servicing her account. *See* Amended Complaint at ¶19.

This contact was particularly damaging, because Defendant McLaren had known the Client since approximately 2021, at which time he was performing employment services for the Client in

and around New York; it was pursuant to these services in New York that he had eventually turned the Client on to working with Conflict International and Mr. Komorek. *Id*. at ¶20.

Upon learning of the defamatory statements that Defendant McLaren had made about him, on February 24, 2022, Mr. Komorek reported it to Mr. LaCorte. On information and belief, Mr. LaCorte took no steps to discipline Defendant McLaren or otherwise resolve the problem. *Id*. at ¶21. On February 25, 2022, Mr. Komorek resigned from the Company. *Id*. at ¶25.

With a colleague, Mr. Komorek built his own company called API International Consulting Group, Inc. ("API"), which is engaged in private investigations work. *Id*. at ¶26. In a short period of time, Mr. Komorek helped build API into a successful venture. Yet the Defendants—his former employer, colleagues, and affiliates—responded to Mr. Komorek's resignation with a pattern of retaliatory behavior designed to harm his reputation and injure his new company. *Id*. at ¶28.

In particular, the Client was loyal to Mr. Komorek and became a client of API. Thus on April 1, 2022 at 3:52am, Defendant McLaren contacted the Client through e-mail accusing Mr. Komorek of being delinquent on a fabricated debt and of lying to the Client about it (the "April Defamation"). In full, he stated:

> You have been told third party misinformation.
> The truth of the matter is I politely asked Stephen Komorek to pay me the money he owes me from [a] 10% commission and he refused. I then decided to end my business relationship and friendship with him since he did not keep his word.
> I have no interest in any drama and zero energy for negativity.
> Integrity and loyalty is everything to me. Victoria is a honest and trustworthy human being who is altruistic, charismatic and compassionate. I'm blessed to have her and her husband Nik in my life for over a decade. They are amazing parents and salt of the Earth people.
> Sometimes it takes years and some soul searching to realize who is lying and who is telling the truth.

> I wish you success and happiness and I have faith you will
> eventually figure out who is lying and who is telling the truth.
> 'It's easier to fool people than to convince the, that they have been
> fooled'-Mark Twain

*See* Amended Complaint at ¶30.

Later in the month, an investigative team working on behalf of Conflict International submitted a request to obtain, among other things, confidential medical records from Mr. Komorek's time serving in the United States Armed Forces (the "Illegal Medical Records Request"). *Id*. at ¶31.

On May 8, 2022, at approximately 9:43am, Defendant McLaren contacted an executive at a leading law enforcement newspaper *Law Enforcement Today*, Kyle Reyes, and sent him a report, whose contents he adopted as true, accusing Mr. Komorek of fabricating his resume and being a con (the "May Defamation"). Defendant McLaren used this report as part of an allegation that a related article he thought had been ghostwritten by Mr. Komorek was "complete B.S." *See* Amended Complaint at ¶34; Ex. A to Amended Complaint.

The conduct followed Mr. Komorek through Spring 2022. Leading into the summertime, API was in mature conversations to join, merge with, or be acquired by a third-party entity (the "Proposed Merger Event"). *Id*. at ¶35. The third party was called Global Pursuit Investigations ("GPI"), was run out of Huntington Beach, California, and, as Mr. LaCorte knew, its leader Logan Clarke was a high-level and longstanding member of a powerful trade organization for private detectives. *Id*. at ¶101. Mr. LaCorte became aware of the Proposed Merger Event. And on or about June 23, 2022, he, acting on Conflict International's behalf, filed a frivolous and retaliatory administrative complaint against Mr. Komorek with that trade organization, World Association of

Detectives (the "WAD"), with whom Mr. Komorek had been affiliated (the "Retaliatory Complaint").  *Id.* at ¶¶35-37.

Included within the Retaliatory Complaint were a series of claims the majority of which were ultimately dismissed as having "no merit."  *Id.* at ¶¶38-42.  *See also* ECF Doc. 35, Decision. But the damage had been done, as the Proposed Merger Event fell apart—with GPI citing "the commotion i'm hearing from several people in WAD."

On August 3, 2022, at 2:08am, Defendant McLaren contacted Mr. Komorek's business partner, Patrick Welsh (the "Partner"), on LinkedIn in an attempt to damage the business by undermining trust between the partners (the "August Defamation 1").  He wrote:

> SK is a pathological
> Liar
> I have his military records he is a complete fraud
> I tried to take high road but his non stop harassment and slander
> needs to be addressed

Moments later, Defendant McLaren sent the Partner a defamatory utterance containing further false and defamatory claims against Mr. Komorek ("August Defamation 2").  And the same morning still, Defendant McLaren made additional false and defamatory statements about Mr. Komorek being a conman and fraud ("August Defamation 3").  He wrote to the Partner on LinkedIn:

> Discharged from the National Guard as medically unfit for service,
> but that also covers behavioral discharges.  it is reported he was
> found to be a habitual liar.
> No personally earned awards.
> Education all correspondence courses.
> Not a military intelligence soldier as claimed
> Not special forces as claimed
> Not assigned to special operations as claimed
> No college
> No security clearance, records show he was denied a clearance.

*See* Amended Complaint at ¶¶43-45.

On November 4, 2022, Mr. Komorek and API filed suit, alleging violations of New York's newly amended Labor Law §740, tortious interference with prospective economic advantage, and a series of defamation claims—ultimately amending the pleadings as of right on February 28, 2023.  The Defendants have moved to dismiss the case on the pleadings, alleging that the Plaintiffs fail to state a cause of action.  Their motion should be denied.

## **STANDARD**

"It is well established that a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Kahn v. Inspector Gen. of U.S. Dept. of Health & Human Servs.*, 848 F. Supp. 432, 435 (S.D.N.Y. 1994) (internal quotations omitted).  "The scope of the court's task is a limited one in that the likelihood of recovery on the face of the complaint cannot be considered in granting or denying the motion," and, instead, the complaint must be viewed in the light most favorable to the non-moving party."  *Id*. (internal references omitted).  "The burden on the moving party is heavy because 'the sanction of dismissal is harsh,' *Duncan v. AT & T Communications, Inc.,* 668 F.Supp. 232, 234 [S.D.N.Y.1987], and because the purpose of pleading is to facilitate a proper decision on the merits." 103.  *See Kahn*, 848 F. Supp. at 435.

**ARGUMENT**

I.    **DEFENDANTS' MOTION TO DISMISS THE LABOR LAW CLAIM SHOULD BE DENIED.**

As a rising executive at Conflict International, Stephen Komorek grew concerned about the Company's increasingly obvious patterns of unethical and illegal behavior. He noticed that it was over-billing clients for hours that were not worked or for services that were not performed, and that it was sending investigators out to solicit business in states where doing so was prohibited by their lack of licensure. *See* Amended Complaint at ¶¶15-16. He brought these concerns to his boss and supervisor, Mr. LaCorte, the Company's present and owner. But in response he was met with an insistence on continuing business as usual, followed by a campaign of retaliation meant to discredit and silence Mr. Komorek before he could escalate his concerns beyond the Company's president. This campaign has drawn on Conflict International's considerable powers, and it has culminated in the termination of Mr. Komorek's employment followed by a series of attempts to sink his career. The results have left Mr. Komorek removed from the World Association of Detectives ("WAD"), an organization of which Mr. LaCorte used to be the President[1]; they have unwound business opportunities of Mr. Komorek's new company, API[2]; and they have threatened his relationships with clients and colleagues.

Labor Law §740 prohibits this conduct, as it constitutes unlawful retaliation against an employee for attempting to address business practices he reasonably believed to be improper. *See* Labor Law §740(2) ("An employer shall not take any retaliatory action against an employee … because such employee … discloses … to a supervisor … an activity, policy or practice … that the employee reasonably believes is in violation of law, rule or regulation"). Indeed, it is the

---

[1] Def. Memo at 29, fn. 4.
[2] Amended Complaint at ¶102.

precise type of whistleblowing that New York seeks to encourage.  *See, e.g., Ulysse v. AAR Aircraft Component Servs.*, 841 F. Supp.2d 659, 678 (E.D.N.Y. 2012) ("Its direct purpose is to protect the whistleblower that makes a complaint … and thereby indirectly encourage[] these complaints to be made").  Yet the Company's attempt to silence him now continues into the courtroom, where it seeks to have the retaliation claim dismissed before the advent of discovery.  It argues that the pleadings do not identify the complained-of conduct, that the complained-of conduct implicates third-parties rather than Conflict International, that the conduct was not tethered to a reasonable belief of impropriety, and that it did not pose a legally sufficient "danger to public health or safety." *See* Defendants' Memorandum of Law ("Def. Memo") at 4-14.  These arguments are wholly incorrect as, most notably, they rely upon an obsolete version of Labor §740.  They also rest upon a fundamental misapplication of the case law, inadmissible and irrelevant documents, and what are at best questions of fact for which Fed. R. Civ. P. ("Rule") 12(b)(6) is not designed.  The Company's motion should be denied.

### A. The Company's Argument Rests Upon an Obsolete Version of New York's Labor Law.

On October 28, 2021, New York State passed legislation to significantly expand the scope of protections that the Labor Law provides to whistleblowers.  *See, e.g.,* NEW YORK STATE, *Governor Hochul Signs Legislation Protecting Employees from Retaliation* (Oct. 28, 2021), available at: https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protecting-employees-retaliation.  As New York State explained at the time of passage, the "legislation … ensures employees only have to prove that they reasonably believe there is a violation of the law or that there is a substantial or specific danger—whereas before they needed to show that there was an actual violation of law that created and presented a substantial and specific danger … — expanding the type of whistleblowing that is protected." *Id.*

In relevant part, Labor Law §740(2)(a)'s text changed as follows:

> **Former Version:** "An employer shall not take any retaliatory personnel action against an employee because such employee … discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation <u>which</u> violation creates and presents a substantial and specific danger to the public health or safety…." (underline added).

> **Current Version:** "An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such employee … discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation <u>or</u> that the employee reasonably believes poses a substantial and specific danger to the public health or safety…." (underline added).

Nevertheless, the Company anchors its argument about Section 740 to an analysis of statutory elements that no longer prevails—including the now-obsolete requirement for a "substantial and specific danger to the public health or safety." *See* Def. Memo at 5. *See also* Def. Memo at 14-15. And what is more, the Company cites *Webb-Weber v. Cmty. Action for Human Servs., Inc.* for the proposition that the pleadings must allege facts that would violate a "specific law, rule, or regulation"—precisely the opposite of what *Webb-Weber* actually held. *See* 23 N.Y.3d 448, 452 ("The plain language of Labor Law §740(2)(a) does <u>not</u> impose any requirement that a plaintiff identify the specific law, rule or regulation violated….") (underline added).

What is required under the statute is what Plaintiffs have alleged in this case. Mr. Komorek became aware of conduct that he reasonably believed was in violation of law, rule or regulations—namely, the systemic overbilling of clients and the solicitation of business in states without required licensing; and his employer responded through a campaign of retaliation against him. *See*

Amended Complaint at ¶¶15-16, 24-25, 48-56.  This conduct is what Labor Law §740 now squarely prohibits.

> **B.  The Company's Argument Ignores the Plain Text of the Pleadings and Relies Upon Disputed Questions of Fact.**

The Company argues that the pleadings "fail[] to identify the particular activities, policies or practices in which the employer allegedly engaged," fail to plead facts supporting a "reasonable" belief of impropriety, and center their allegations on conduct committed by third-parties rather than Conflict International.  *See* Def. Memo at 5-12.  These arguments are fundamentally erroneous, as they ignore the plain text of the pleadings, rely upon disputed questions of fact, and hinge on a recitation of licensing "reciprocity" that is materially incomplete.  For these reasons, set forth more fully below, the Company's motion to dismiss the Labor Law §740 claim should be denied.

> 1.  <u>The Pleadings Set Forth the Particular Policies and Practices in Issue.</u>

The pleadings set forth the particular policies and practices that sparked Mr. Komorek's reasonable belief of impropriety.  The Company was overbilling clients by charging for work not performed or for hours that it had not worked, and it was violating state licensing requirements by soliciting business in states where doing so required a license that the Company lacked.  *See, e.g.,* Amended Complaint at ¶¶15-16, 48-49.  The Company responds by disputing the nature of Mr. Komorek's complaints:  they "amounted to complaints that his advice was not being followed," the Company says; "[t]here were no communications of any kind [of the sort alleged in the pleadings]," and Mr. Komorek "had … absolutely no access to UK client files, billing statements or practices" which "more often than not" included a "flat rate fee…."  *See* Def. Memo at 6, 9.

These arguments amount to denials of the factual allegations—i.e. denials of the nature of Mr. Komorek's internal complaints, and denials that their billing arrangements with clients could lend themselves to abuse.  But on a pre-answer motion to dismiss, "the Court must ask whether any set of facts consistent with the complaint would give the plaintiff a right to recover.  The answer to this question cannot be, to paraphrase Defendant's submissions, 'No, because the allegations are false.'"  *See Michael Grecco Productions, Inc. v. Alamy, Inc.*, 372 F. Supp.3d 131, 135 (E.D.N.Y. 2019).

Ultimately, the standard is oft-quoted but worth repeating here: on a Rule 12(b)(6) motion, courts "must accept as true the allegations contained in the complaint and draw all reasonable inferences in favor of the nonmoving party."  *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 216 (2d Cir. 2004).  *See also Oladokun v. Ryan*, 2007 WL 3125317, fn. 2 (S.D.N.Y. 2007) ("This dispute of fact is not properly considered at the motion to dismiss stage").  By elevating questions of fact in its motion papers, then, the defense has emphasized precisely why Rule 12(b)(6) relief is unavailable.

2.   Dismissal Is Not Warranted by the Alleged "Reciprocal
      Licensing Agreements."

Dismissal is not warranted by the alleged "reciprocal licensing agreements" between North Carolina, on one hand, and California and Florida on the other.  *See* Def. Memo at 10.  That is because the allegations in the pleadings do not just pertain to investigative-work generally, but specifically to solicitation.  *See* Amended Complaint at ¶16.  Mr. Komorek had more than a good faith belief that the "reciprocal licensing agreements" in issue do not allow for such unlicensed solicitation—because they do not.  *See, e.g.,* Limited Reciprocity Agreement for Private Investigations (California and North Carolina), available at:

https://www.bsis.ca.gov/industries/pi_recip/nc.pdf ("The exemption does not authorize private investigators or private investigative agencies to solicit private investigative business in the reciprocating state or to conduct private investigative business in the reciprocating state other than as specifically stated in this paragraph") (underline added); Private Investigator Reciprocity (Florida), available at: https://www.fdacs.gov/Business-Services/Private-Investigation-Licenses/Private-Investigator-Reciprocity ("The investigator is prohibited from soliciting business while in another state"). *See also* States With Limited Reciprocity (North Carolina), available at: https://files.nc.gov/ncdps/documents/files/Private-Investigator-Reciprocal-Agreements.pdf ("North Carolina investigators may not solicit private investigative business or open an office while in one of these other states").

Having analyzed the rules for state licensure and come to the good faith conclusion that Conflict International was violating basic licensing rules, Mr. Komorek was permitted to bring his conclusions to his supervisor and leader—who, in turn, was not allowed to retaliate against him in response.

      3.   The "Complicated Patchwork of State Licensure" Does
             Not Undermine the Pleadings.

The Company does not revive its argument through resort to the "complicated patchwork of state licensure" which, in its view, mean that the Company "simply cannot answer [the] vague and conclusory pleadings." *See* Def. Memo at 12. If the Company truly believed that the pleadings in this case were too vague to answer, it could have moved under Rule 12(e) for a more definite statement. *See, e.g., In re Methyl Tertiary Butyl Ether Products Liability Litigation*, 233 F.R.D. 133, 134 (S.D.N.Y. 2005). The standard there would have required a complaint that, without a more definite statement, is "so excessively vague and ambiguous as to be unintelligible" (*id*.)

(internal quotations omitted)—a standard that would have been belied by the opposition papers filed by the defense, which analyze the pleadings claim-for-claim and in detail.

The Company did not seek a more definite statement because the pleadings are clearly straightforward enough to answer.  They allege that Mr. Komorek had a reasonable belief that the Company was soliciting business in Florida, California, Illinois and other states without a proper license; that he brought this to his employer's attention; and that he was retaliated against in response.  Amended Complaint at ¶¶15-16, 24-25, 48-56.  State licensing requirements might be complicated, but these pleadings are simple—and they state a cause of action under Labor Law §740.

4.   The Pleadings Do Not Rely Upon Third-Party Fault.

Finally, the pleadings state a cause of action regardless of the employment status of the Company's accountant.  *See* Def. Memo at 7-8.  That is because whatever job an accountant might have performed for the Company, the pleadings in this case allege that the improprieties were done at the behest of the Company's own leader—Mr. LaCorte.  *See* Amended Complaint at ¶15 ("Mr. LaCorte began to pressure Mr. Komorek to institute the same fraudulent practices in New York").

Indeed, by its nature, the practice of overbilling clients is not a job that one would traditionally associate with being performed by a third-party accountant, who rely upon the client to provide accurate billing records rather than generating billing reports on their own.  Here on a pre-answer motion to dismiss, the Company is not entitled to the favorable and implausible inference that this practice of overbilling was performed by company-outsiders with no incentive to do so.  *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 216 (2d Cir. 2004) (requiring that the court "draw all reasonable inference in favor of the nonmoving party").

Moreover, the Company bases its third-party-fault argument on the erroneous premise that "Komorek's only accounting related complaints to Conflict were complaints against a specific, third-party … firm…." *See* Def. Memo at 7.  *See also id.* at 8 ("Komorek's complaint is a personal grievance against a third-party C.P.A., not Conflict's accounting practices").  Yet, once again, this amounts to the defective argument that dismissal is warranted because the Company simply denies the allegations about having made billing-related complaints to Mr. LaCorte.  "[T]he allegations are false" is the starting point for an answer and discovery, not a Rule 12(b)(6) motion.  *See Michael Grecco Productions, Inc. v. Alamy, Inc.*, 372 F. Supp.3d 131, 135 (E.D.N.Y. 2019).

**C.  The Company's Reliance upon Documentary Evidence is Misplaced.**

The Company argues that insofar as the Labor Law claim relies upon allegations of overbilling, it is belied by the contents of e-mails and text messages from 2020 in which Mr. Komorek allegedly made complaints about the firm's accountant.  *See* Def. Memo at 8.  *See also* Ex. A of Def. Memo.  This argument is doubly defective, for it relies upon documentary evidence improperly, and it inherently relies upon disputed questions of fact as to the nature of Mr. Komorek's complaints.

1.  Defendants' Resort to Documentary Evidence (Ex. A to
    Def. Memo) Is Inappropriate Given the Structure of the
    Pleadings.

As a baseline rule, "[i]n considering a Rule 12(b)(6) motion, the court is normally required to look only to the allegations on the face of the complaint"—which the contents of the e-mails and text messages attached to the defendants' motion were not.  *See, e.g., Epstein v. NYC Council of Carpenters Benefit Funds*, 2016 WL 1718262, at *2 (S.D.N.Y. 2016) (internal references omitted).  Nevertheless, courts may consider documents beyond the four corners of a complaint when those "[d]ocuments … are attached to the complaint…[,] incorporated in it by reference," or

are documents upon which the complaint "*solely* relies and which [are] *integral to the complaint*…." *Id.* (internal references omitted) (emphasis in original). But none of these exceptions applies here.

Clearly, the e-mails and text messages are not "attached to the complaint." They also are not "incorporated" into the complaint. As a matter of law, a "mere passing reference or even references … to a document outside of the complaint does not, on its own, incorporate the document into the complaint itself." *Williams v. Time Warner Inc.*, 440 F. Appx 7, 9 (2d Cir. 2011). And here the complaint never once mentions the communication reflected in Exhibit A to the Defendants' submission—never identifying any communications from 2020 whatsoever, and instead describing complaints of overbilling which the attached e-mails and text messages do not address. *Compare* Amended Complaint at ¶15 *and* Ex. A to Def. Memo.

Ironically, as set forth below, the basis of the Defendants' argument is precisely that point: that the attached e-mails and text messages <u>are not</u> the complaints of impropriety that are alleged in the pleadings. *See* Def. Memo at 7. Mr. Komorek worked for Conflict International for nearly three years. The fact that he may have made more than one complaint to his boss during that time does not mean that a lawsuit's reference to one automatically "incorporate[s]" the other.

Finally, the complaint neither "solely" relies upon these e-mails and text messages nor are they "integral" to the allegations. This category of acceptable documentary evidence comprises a "narrow set of circumstances," after all, focusing on cases where the plaintiff "relies heavily on the document's terms and effect in pleading his claims…." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 107-08 (2d Cir. 2021). Yet that scenario is distant from the structure of the pleadings here, which can make out the essential elements of the claims in issue without resort to these e-mails or text messages at all.

Accordingly, the Defendants' reliance upon this documentary evidence is self-defeating, because this documentary evidence is not an appropriate consideration for a motion based upon the sufficiency of the pleadings.  The motion should be denied.

    2.  <u>The Documentary Evidence's Relevance Hinges on a
        Disputed Question of Fact.</u>

Ultimately, the thrust of the Defendants' argument is that evidence of some complaints (about an accounting firm) proves that Mr. Komorek did not make other complaints (about overbilling).  "Plaintiffs' complaints regarding accounting practices are actually complaints against an individual employed at a third-party accounting firm," they say, and "Komorek's only accounting related complaints to Conflict were complaints against … [that] third-party … firm…." *See* Def. Memo at 7.  This logic plainly resorts to a disputed question of fact—namely, whether in the years of Mr. Komorek's employment he made more than just one type of complaint to his boss regarding the company's accounting practices, with one pertaining to a third-party firm and another pertaining to how the Company itself accounted for its work.  Later in this litigation, the defense might press an (erroneous) argument that there was only one type of complaint ever lobbed.  But that claim is not the province of a pre-answer motion to dismiss.  *Oladokun v. Ryan*, 2007 WL 3125317, fn. 2 (S.D.N.Y. 2007) ("This dispute of fact is not properly considered at the motion to dismiss stage").  As the Defendants' argument rests upon disputed questions of fact, its requested relief under Rule 12(b)(6) is improper and should be denied.

## II.  DEFENDANTS' MOTION TO DISMISS THE DEFAMATION CLAIMS SHOULD BE DENIED.

As the parties appear to agree, Ohio law governs the defamation claims asserted in the pleadings.  This is because "discouraging defamation is a conduct regulating rule," and "[b]ecause the locus of the tort is where the plaintiff suffered injury, often the Court can resolve the choice of

law analysis in a defamation action simply by observing the state of plaintiff's domicile and presuming that the publication injured him in that state." *See Adelson v. Harris*, 973 F. Supp.2d 467, 467 (S.D.N.Y. 2013) (internal quotations and brackets omitted). *See also Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999) ("the state of the plaintiff's domicile will usually have the most significant relationship to the case, and its law will therefore govern"). Mr. Komorek resides and suffered injury in the State of Ohio.

"In Ohio," its Supreme Court has held, "'libel' is defined generally as a false written publication, made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7 (1995).

The libel claims asserted in this action satisfy these essential elements, and the motion to dismiss them should be denied.

### A. The Pleadings State a Cause of Action for Libel Arising from the April Defamation.

The Defendants seek dismissal of the April Defamation claim, arguing that the utterance in question was a protected expression of opinion rather than an actionable assertion of fact. *See* Def. Memo at 15-16. In gauging this argument, Ohio law engages in a totality-of-circumstances analysis, focusing on "the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared." *Vail v. The Plain Dealer Publishing Co.*, 72 Ohio St.3d 279, 282 (1995).

With that said, "Ohio courts have recognized that, when the allegedly defamatory statements are accompanied by explicit language professing its truth, reasonable readings normally

view the statement as conveying information of a factual nature, rather than as expressing an opinion." *Susan B. Anthony List v. Driehaus*, 805 F. Supp.2d 425, 428 (S.D. Ohio 2011).

Here, the April Defamation is actionable because it lends itself to the reasonable view that Defendant McLaren was making an assertion of fact.  Most notably, Defendant McLaren himself welcomed that view by using the "explicit language professing … truth" that Ohio courts find compelling:  he couched the fabricated debt as "[t]he truth of the matter," and, doubling-down, referred to a denial of that debt as "lying."  *See* Amended Complaint at ¶30.  These terms—"truth" and "lying"—are the provinces of facts.

The factual nature of the April Defamation is corroborated by the reality that it is verifiable. Defendant McLaren claims that the debt arose "from [a] 10% commission" that allegedly existed. Discovery will help the parties uncover the nature of that purported commission agreement, but the very fact that that inquiry is possible lends itself to the terrain of fact rather than opinion.

Finally, the factual nature of the utterance is supported by its surrounding context. Defendant McLaren made this statement to a mutual friend and former client, Ms. Jacobson, as part of a campaign to undermine Mr. Komorek's relationship with her and his new business venture—and a campaign he continued with other similarly factual (and false) allegations.  *See* Amended Complaint at ¶¶30, 33-34, 43-45.  Having Ms. Jacobson (and others) believe that Mr. Komorek factually lied was the point of the endeavor.  Such an implication of fact is also why the utterances are actionable.

At bottom, in the State of Ohio, statements far less fact-based than the April Defamation would qualify as actionable.  Indeed, "[e]ven a statement cast in the form of an opinion ('I think that Judge X is dishonest') implies a factual basis, and the lack of support for that implied factual

assertion may be a proper basis for a penalty." *Disciplinary Couns. V. Gardner*, 99 Ohio St.3d 416, 419 (2003) (analyzing contours of First Amendment). *See also Mehta v. Ohio Univ.*, 194 Ohio App.3d 844, 861 (Ct. Appeals, Tenth District, 2011) (deeming actionable an utterance that "appellant had contributed to a culture of academic dishonesty"). Defendant McLaren's request to dismiss the April Defamation claim should be denied.

## B.  The Pleadings Sufficiently Identify Falsehood.

The Defendants argue that dismissal is required because the pleadings do not allege the requisite falsity of the defamatory utterances in issue. In their view, the "necessary allegations" would have been that "McLaren was not owed money and that Komorek did not exaggerate his experience, service record or qualifications[.]" *See* Def. Memo at 21-22. Because falsity is an essential element of defamation under Ohio law, they argue, the lack of falsity-allegations requires dismissal.

The problem with this argument is, the very allegations that the defense labels "necessary" appear on the face of the Amended Complaint. The pleadings allege that Mr. McLaren <u>was not owed money</u>. *See* Amended Complaint at ¶61 ("The April Defamation was knowingly false, as Mr. Komorek was not delinquent on any debt, never owed Mr. McLaren money, and is not a liar"). And they allege that Mr. Komorek <u>did not exaggerate his credentials</u>. *Id*. at ¶69 and 85 ("Mr. Komorek did not misrepresent his resume or experience"), ¶77 ("Mr. Komorek's representations about his background are utterly true"); ¶93 ("Mr. Komorek was not discharged from the National Guard for behavioral reasons; he was not found to be a habitual liar; he had personally earned awards; he had received education beyond correspondence courses; and he never claimed to be a military intelligence solder, a member of the Special Forces, or to have graduated college; though he does have extensive experience in military intelligence, in working with Special Forces and

with Special Operations.  He was also never denied security clearance").  Thus by the Defendants'

own accounting of what Ohio law would require, the defamation allegations here pass muster.

To the extent that the Defendants believe that Ohio law required even more than what the

pleadings alleged here, they confuse the "burden of *proof*" with the "burden of *pleading*":  "in

addition to alleging that [the] allegedly defamatory statements were false, the [defense] would

require [Plaintiffs] to demonstrate facts to prove falsity of the statements within the complaint."

*Fisher v. Ahmed*, 153 N.E.3d 612, 628 (Ct. Appeals, Ohio 2020) (italics in original).  "This

heightened pleading standard is not substantiated by the legal authority cited…, nor [was the

*Fisher*] Court aware of any such authority."  *Id*.  The pleadings in this case identify the defamatory

statements and describe why they are false.  The motion to dismiss on grounds of the falsity

element should therefore be denied.

### C.  The Common Interest Privilege Is Unavailable.

The defense argues that the defamatory statements made to Patrick Welsh (August

Defamations 1, 2 and 3) should be dismissed from this litigation due to the "common interest

privilege."  *See* Def. Memo at 16-19.  While it performs a detailed investigation into the rules and

policies surrounding this privilege, the defense glosses over a decisive fact:  the utterances in issue

were alleged in August 2022—long after Mr. Komorek and Mr. Welsh had departed from Conflict

International.  *See* Amended Complaint at ¶¶43-45.[3]  *See also* Amended Complaint at ¶¶25-26

(reciting that Mr. Komorek resigned the prior February, and "[w]ith a colleague, … built his own

company").

---

[3] Patrick Welsh departed from Conflict International in or about March 2022.

Thus, it may be true that the common interest privilege can apply "between an employer and an employee or between two employees concerning the conduct of a third or former employee." *See, e.g., Mason v. Bexley City School Dist.*, 2010 WL 987047, at *30 (S.D. Ohio 2010). But this case presents none of those scenarios. Assuming *arguendo* that McLaren was an "employee" at all, this was an utterance made by an employee to a <u>former</u> employee about a different <u>former</u> employee—where there was no "common interest" left between the speaker, the receiver or the victim. Instead, the utterances trespassed over the straightforward limit of the doctrine—that when the utterance is made "with someone outside of the qualified privilege, protection … is lost." *Borrows v. Fuyao Glass Am. Inc.*, 2017 WL 6262189, at *8 (S.D. Ohio 2017).

What is more, the common interest privilege is unavailable because there is no common interest that Defendant McLaren was trying to protect. Just the opposite: as alleged, he uttered the defamatory statements as part of a malicious campaign to harm Mr. Komorek and his new company. *Id.* (explaining that the "privilege is lost" if the defamation "is done with actual malice"); Amended Complaint at ¶1 ("the company and its agents engaged in a widespread smear campaign that included repeated bouts of defamation to Mr. Komorek's new business partner…."). Indeed, the pleadings allege that the statements made as part of that campaign were knowingly false. *See id.* at ¶¶77-78, 85-86, 93-94. And these allegations are bolstered by the content of Mr. McLaren's utterances, which accused Mr. Komorek of lying about his military credentials while at the same time claiming that he (McLaren) was in possession of those military records. Assuming the truth of the pleadings, those records in McLaren's possession would demonstrate the falsity of the utterances on their face. *See, e.g.,* Amended Complaint at ¶93 ("Mr. Komorek was not discharged from the National Guard for behavioral reasons; he was not found to be a

habitual liar; he had personally earned awards; he had received education beyond correspondence courses; and he never claimed to be a military intelligence solder, a member of the Special Forces, or to have graduated college; though he does have extensive experience in military intelligence, in working with Special Forces and with Special Operations.  He was also never denied security clearance").

Because the common interest privilege is unavailable, and because the existence of actual malice would render it toothless here in any event, the Defendants' application to dismiss the defamation claims should be denied.

### D.  The Defendants' Analysis of Exhibit A is Erroneous.

The Defendants argue that the May Defamation claim should be dismissed as contradicted by Exhibit A to the Amended Complaint.  In their view, the exhibit shows that the defamatory statement was made by a third-party (V.P.) rather than by Defendant McLaren, and that, in any event, Defendant McLaren labeled it as "B.S." and invited the recipient to do his own research on the topic.  *See* Def. Memo at 23 (referring to an "Exhibit B" and adding, "Simply referring an individual to another source of information does not meet the standard of a defamatory statement").  These arguments misconstrue the pleadings and the Defendants' own Exhibit B.  The Defendants' request to dismiss the May Defamation claim should be denied.

First, the plain reading of the Amended Complaint explains the relationship between the report contained in the e-mail from V.P., on one hand, and the (gray background) message immediately below it by Defendant McLaren on the other.  While McLaren did not author the report himself, he forwarded it in a message to a reporter at *Law Enforcement Today* and "adopted [it] as true"—using it to explain why another article, which he believed was written by Mr. Komorek, was "complete B.S."  *See* Amended Complaint at ¶34.  Contrary to the Defendants'

suggestion, this adoption squarely brings Defendant McLaren within the ambit of defamation liability. *See, e.g., Long v. Marubeni Am. Corp.*, 406 F. Supp.2d 285, 298-99 (S.D.N.Y. 2005) ("'One who republishes a defamatory statement (originally made by another) "adopts" it as his own and is liable in equal measure'") (quoting Sack on Defamation §7.1). *See also Croce v. New York Times Co.*, 345 F. Supp.3d 961, 976 (S.D. Ohio 2018) (describing rule and addressing narrow and inapplicable carveout in Ohio for members of the press to report on legal and municipal proceedings).

Read in proper context, Defendant McLaren's reference to "complete B.S." was not some attempt to defend Mr. Komorek against the report's falsehoods. This is readily apparent from the series of other defamatory utterances from him that make the same false allegations as the ones contained in Exhibit A's report. *See* Amended Complaint at ¶43 ("I have his military records he is a complete fraud"). *See also id*. at ¶45.

Second, far from being diluted by the contents of Defendants' Exhibit B, the communications reflected in that exhibit accentuate the actionable nature of the May Defamation. As previously identified, "explicit language professing … truth, … normally [leads Ohio courts to] view the statement as conveying information of a factual nature…." *Susan B. Anthony List v. Driehaus*, 805 F. Supp.2d 425, 428 (S.D. Ohio 2011). And whether an utterance is actionable depends on whether it "implies a factual basis." *Disciplinary Couns. V. Gardner*, 99 Ohio St.3d 416, 419 (2003) (analyzing contours of First Amendment) (noting that "[e]ven a statement cast in the form of an opinion ['I think that Judge X is dishonest'] implies a factual basis, and the lack of support for that implied factual assertion may be a proper basis for a penalty"). Here, Defendant McLaren has done both at the same time:  he has said that Mr. Komorek's "military records" will enable one to "see who is lying and who is telling the truth pretty easily"—both couching the

defamatory assertion in professed truth <u>and</u> implying a "factual basis" for the assertion by way of the alleged "military records." *See* ECF Entry No. 45-2, at 4 of 4.

The pleadings state a libel claim arising out of the May Defamation, and the motion to dismiss this claim should be denied.

## III.    DEFENDANTS' MOTION TO DISMISS THE TORTIOUS INTERFERENCE CLAIM SHOULD BE DENIED.

The Plaintiffs' cause of action for tortious interference with prospective business advantage should be governed by Ohio law.  That is because, when the defendant's conduct occurs (as here) "in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp.2d 246, 277 (S.D.N.Y. 2007) (internal references and ellipses omitted).  In turn, "[t]he tort of tortious interference with contract [and prospective business advantage] requires that the plaintiff suffer damages, which is the last event that would render a putative tortfeasor liable," and is thus the "place of the wrong."  Here, Ohio is the site of such damages—as it is where API International Consulting Group has its headquarters and is the state of Mr. Komorek's residence.[4]

Under Ohio law, tortious interference with prospective economic advantage—otherwise labeled tortious interference with a business relationship—"occurs when a person, without privilege to do so, induces or otherwise purposefully causes a third person not to enter into … a business relationship with another."  *See, e.g. Gentile v. Turkoly*, 86 N.E.3d 991, 997 (Ct. Appeals, Ohio 2017).  The elements are "(1) the existence of a prospective business relationship; (2) the

---

[4] The pleadings indicated that Colorado law would govern this claim, which was based upon the fact that Colorado was the location in which the World Association of Detectives was headquartered and, in turn, was the location where the administrative allegations were filed.  However, on reconsideration of New York's choice of law principles, and the rules identified in cases like *Hidden Brook Air*, *supra*, Ohio appears to win the choice of law contest.

wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Id*.

The claim "does not require the breach of contract," Ohio law holds, but "rather it is sufficient to prove that a third party does not enter into … a business relationship with the plaintiff." *Id*. (internal quotations omitted). The claim is broad enough to pertain to "'any prospective contractual relations if [it] would be of pecuniary value to the plaintiff.'" *Id*. (quoting Restatement of the Law 2d, Torts [1979], Section 766B).

To measure whether the interference with business relations was sufficiently "improper," Ohio courts, citing the Restatement, consider "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Gray-Jones v. Jones*, 137 Ohio App.3d 93, 100-01 (Ct. Appeals, Ohio 2000) (citing Restatement of the Law 2d, Torts [1979] 26, Section 767).

Here, the pleadings state a cause of action for tortious interference because they allege a prospective business relationship—a contemplated merger—with another investigative agency called Global Pursuit Investigations (Amended Complaint at ¶¶35, 100-101); that Defendants became aware of this event (*id*. at ¶36); that in response they filed false and scandalous allegations against Mr. Komorek with a powerful trade organization, the WAD (*id*. at ¶¶37-42), of which the defense admits that Mr. LaCorte was a past-President and has present voting rights (Def. Memo at 29, fn. 4) and of which the owner of the merger-counterparty was also a longstanding member (Amended Complaint at ¶101); and that as an intended consequence of the allegations the

contemplated merger fell apart, with the counterparty specifically citing "the commotion i'm hearing from several people in WAD." *See id*. at ¶102.

Nevertheless, the defense argues that the tortious interference claim should be dismissed because (a) Conflict International was not a "stranger" to the contemplated merger event, and (b) the efforts against Mr. Komorek were not "improper" because two of the many claims brought against him were sustained. *See* Def. Memo at 25-30. These arguments do not withstand scrutiny.

### A. Mr. Komorek Was Not Working on Conflict International's Behalf in the Summer of 2022.

The Defendants' claim that it was not a "stranger" to the proposed event relies upon utterly inappropriate factual allegations that emerge from beyond the four corners of the pleadings. That is, they set forth that in "June 2021, Conflict organized and paid to send … Komorek[] to attend … Mr. Clarke's event on Conflict's behalf" during which "Mr. Komorek did indeed discuss doing business with Logan Clarke and GPI during that trip." *See* Def. Memo at 26. Thus, their argument concludes, it is "not plausible that Conflict could be considered an interfering third party because Komorek did so on Conflict's behalf." *Id.*

While this entire factual premise is hollow, as set forth below, it is also squarely inappropriate on a Rule 12(b)(6) motion, because none of these allegations appear in the pleadings. "In considering a Rule 12(b)(6) motion," the Second Circuit holds, "the court is normally required to look only to the allegations <u>on the face of the complaint</u>." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (underline added). This alleged June 2021 meeting is not alleged or referenced in the pleadings, and is thus not a proper basis on which to seek Rule 12(b)(6) relief.

What is more, even if resort to these factual recitations were permissible, the existence of a meeting with Logan Clarke in "June 2021" has no bearing on whether there were mature business

opportunity discussions between him and Mr. Komorek's new company leading into the "summer of 2022"—approximately a year later.  *See* Amended Complaint at ¶35.  By that time, all parties would acknowledge, Mr. Komorek's employment with Conflict International had long since terminated.  *See* Amended Complaint at ¶25 (describing termination in February 2022).

Thus, Conflict International was not remotely an insider to the merger discussions that took place between a third-party company and one of its ex-employees who was now working at a new venture.  Yet the defense presses this argument through five straight pages of its brief.  *See id*. at 25 (Mr. Komorek was "for the relevant time an employee of Conflict"); 26 ("The discussions took place … while Komorek was Conflict's employee"); 27 ("a party cannot … tortiously interfere with its own contract," and "agents acting within the scope of their employment … do not constitute intervening third parties"); 28, fn. 3 ("only a stranger to a contract, such as a third party, can be liable for tortious interference").

The premise of the tortious interference claim is that Conflict International targeted Mr. Komorek and his new company exactly <u>because</u> he was no longer working for Conflict and had departed on acrimonious terms for which it sought reprisal.  As an ex-employee of the firm, there was no insider-status between the merger discussions and Conflict International at all—and instead this action reflects the far more typical example of companies and ex-employees engaged in litigation over claims of tortious interference.  *See, e.g., Kienow v. Cincinatti Children's Hosp. Med. Ctr.*, 2015 WL 6438985, at *1 (Ct. Appeals, Ohio 2015) (sustaining tortious interference claim where former employee lost a job opportunity after prior company "made negative, misleading and false statements about her to the hiring manager").  The motion should be denied.

### B. Conflict International's Conduct was Sufficiently Improper to Form a Tortious Interference Claim.

Targeting Mr. Komorek with false and salacious allegations with the aim of damaging his reputation and instilling economic pressure against him, for the purpose of undermining a potential merger event that could have garnered significant new profit centers for his business, is sufficiently improper under Ohio law to form a basis for tortious interference with prospective economic advantage.  The allegations were part of a retaliatory effort to remove Mr. Komorek from an esteemed position and membership within an internationally recognized trade and networking association, knowing that such a commotion would assert the type of economic pressure on his new business that would render the proposed merger event unviable.[5]

The crux of the Defendants' argument to the contrary is that Mr. LaCorte made the allegations in his personal capacity—not as an agent of Conflict International—and that the success of two claims against Mr. Komorek renders the entire exercise privileged under Ohio law. This analysis is not correct.

First, the notion that Mr. LaCorte lobbed the allegations against Mr. Komorek outside of his role as agent of Conflict International is belied by his own arguments before the Court—where, to obtain dismissal in this action, he made the concession that "the claims for which [he] is being sued *all* relate to Mr. LaCorte's business activities in New York that were undertaken on behalf of the corporate entity Conflict International, Inc.  *See* Memorandum of Law in Support of LaCorte's Motion to Dismiss ("LaCorte Memo") at 14.  "[T]he claims upon which Mr. LaCorte is being

---

[5] While the present motion papers do not rely upon the procedural aspects of the allegations before the WAD, on information and belief discovery will illuminate that Mr. LaCorte used his considerable influence within the organization to ensure an outcome that he at least partially desired on behalf of Conflict International.  The complaint was made against Mr. Komorek using letterhead of Conflict International Ltd., and, on information and belief, Mr. LaCorte was represented in connection with that complaint by the same office representing Conflict International in this action.

sued," he goes on, "bear no relationship to any possible alleged business conducted personally, as an individual…." *Id*. As the pleadings brought the present claim against Mr. LaCorte individually, his own analysis thus acknowledges that his actions were conducted on Conflict International's behalf.

Second, the Defendants' analysis of whether the conduct was "improper" simply ignores the totality of circumstances analysis required by Ohio law. *Gray-Jones v. Jones*, 137 Ohio App.3d 93, 100-01 (Ct. Appeals, Ohio 2000) (citing Restatement of the Law 2d, Torts [1979] 26, Section 767). The "nature of [its] conduct" was to interpose salacious claims against Mr. Komorek with an important business organization, WAD, which, even though Mr. LaCorte was its past President, still found in Mr. Komorek's favor and against Mr. LaCorte as to nearly every claim brought against him. *See* Amended Complaint at ¶¶38-42.

The "motive" and "interests" for this behavior were patently malicious: though many of the claims had "no merit" according to the WAD (*see* ECF Doc. 35, Decision) they still created an air of embarrassment before the most important professional organization of which Mr. Komorek was a member; they came alongside a range of other behaviors that were similarly troubling—including a request for Mr. Komorek's confidential medical records from the military (Amended Complaint at ¶31) and a series of defamations targeting his business; and, perhaps most concerning, they came to fruition for the very purpose of undermining business opportunities for Mr. Komorek and his new company—arising, as set forth below, in close proximity to Plaintiffs' merger discussions with Logan Clarke and ultimately causing those discussions to fail.

The "social interests" and "contractual interests" could have both been accommodated but were not: the defense now insists that the allegations before the WAD were required to be kept confidential (Def. Memo at 30-31), yet, conspicuously, the very reason why this claim emerges is

because the merger discussions fell apart after, in Logan Clarke's words, "the commotion i'm hearing from several people in WAD." *See* Amended Complaint at ¶102.  If allegations of this nature are supposed to be kept confidential, then the fact that Logan Clarke heard a "commotion" about them warrants a reasonable inference that the party lobbing those false accusations was responsible for the breach of confidentiality.

And, finally, the "proximity of the … conduct to the interference" is pled to be incredibly close:   plaintiffs were engaging in the merger discussions approaching the summer of 2022 (Amended Complaint at ¶35); the retaliatory complaint was lodged on June 23, 2022 (*id*. at ¶37); and the merger discussions had fallen apart by August 2, 2022 (*id*. at ¶102).

Ultimately, the burden on the present motion is "heavy" and rests squarely with the defense to show "beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Kahn v. Inspector Gen. of U.S. Dept. of Health & Human Servs.*, 848 F. Supp. 432, 435 (S.D.N.Y. 1994).  The Defendants' analysis of impropriety does not meet this burden, and their motion to dismiss the tortious interference claim should be denied.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Defendants' motion to dismiss be DENIED; except, however, based upon Mr. LaCorte's representations that he conducted all behavior on behalf of Conflict International Inc., the claims brought against him in his personal capacity are withdrawn.

Dated: Garden City, New York
       April 19, 2023

                                        Respectfully,

                                        **BARKET EPSTEIN KEARON ALDEA
                                        & LOTURCO, LLP**

                                        _____*/s/ Alexander Klein*_____
                                        Alexander Klein, Esq.
                                        Kevin Kearon, Esq.
                                        666 Old Country Road, Suite 700
                                        Garden City, New York 11530